# B. B. BIVENS v. STATE.

No. A-223.    Opinion Filed January 15, 1912.

(120 Pac. 1033.)

1. **LARCENY—Indictment—Allegations.** Where, in an indictment for larceny, the property is charged to have been taken by fraud, it is not necessary to set out the fradulent acts relied upon as constituting the fraud.

2. **LARCENY—Distinguished From Embezzlement.** The distinction between larceny, where the taking is by fraud, and embezzlement, is determined with reference to the time when the fraudulent intent to convert the property to the taker's own use occurs. In larceny the criminal intent must exist at the time of taking the property, and it must be taken with intent to deprive another thereof. If, on the other hand, the taker receives the property as a bailment, intending at the time a compliance with the terms of the bailment, or to conform to the owner's wishes concerning the property, and he afterwards fraudulently appropriates the property to his own use, intending to deprive the owner thereof, the crime is embezzlement.

3. **SAME—Conversion—Criminal Intent.** Where the owner of personal property voluntarily parts with the possession of the same for a particular purpose, and the person who receives the possession avowedly for that purpose has at the time a fraudulent intention to make use of such possession as a means of converting the property to his own use, and does so convert it, the crime is larceny.

4. **LARCENY—Right of Possession—Jurisdiction of Crime.** A larceny does not deprive the owner of the legal right of possession

or right of property, which still continues wherever the stolen property may be carried by the thief, and where a thief brings into this state property which he has stolen in another state, he is guilty of larceny here, and he may be convicted in any county into which he has carried the stolen property.

5.    **SAME.** The courts of this state have no jurisdiction to punish for criminal acts committed outside the state, but in order to ascertain the intention with which an act was done within this state, the acts and declarations of the defendant done and made in any other jurisdiction may be considered in a prosecution for larceny, in order to show the character of the defendant's possession in this state of the property alleged to be stolen.

(Syllabus by the Court.)

*Appeal from District Court, Tillman County; J. T. Johnson, Judge.*

B. B. Bivens, plaintiff in error, was convicted of the crime of grand larceny, and sentenced to serve a term of one year and one day in the penitentiary, and appeals. Affirmed.

The information charges:

"The defendant, B. B. Bivens, then and there being, did then and there wilfully and unlawfully, fraudulently and feloniously take, steal and carry away by fraud, without the consent and against the will of the true owner, forty-five dollars, good and lawful money of the United States and of the value of forty-five dollars, the personal property of one Oscar Weihs, of said county and state, with the unlawful, wilful, felonious and fraudulent intent then and there of him the said B. B. Bivens, to deprive the said Oscar Weihs thereof and to convert the same to his own use and benefit, contrary," etc.

At the trial Oscar Weihs testified that he lived in Texas, and first met the defendant in a hotel at Vernon, Texas, on November 19, 1908.

From the transcript the following is taken:

"Q. Did you have any other business transaction with Bivens that night? A. Why, we slept together in one bed, and I had some greenbacks, $45.00, and he had $5.00 greenbacks. I didn't have but one purse, and I had $12.00 silver, and I asked him what I was going to do and he said, 'I will hide it.' He says, 'Give it here, I will hide it; I will put it away.' He had a black billbook and put the $45.00 in it, and he said, 'Where is your silver?' I said, 'I got it down there,' and he said, 'Give it here.'

He said, 'If you are scared of me, don't hand it to me.' I said, 'Oh, no, I believe you are all right.' I handed it to him and he taken this silver and put it in this little purse, and taken the purse and silver, and threw it under the pillow, inside the sheet around the pillow, and threw the facing of the pillow opening to the north. The bed was extending east and west, and threw the open end to the north with my silver, $11 and something, and he had $45.00 of my greenbacks, and he put that under his pillow, and turned the opening to the south, and went to bed and had the door locked. He asked if I was easy to wake, and I said that I was. The train is due five something, and we got up in the morning and he woke before I did. Q. What did he say to you with reference to giving this money back? A. He said he would give it back in the morning. Q. What was the value of this money? A. $45 in greenbacks. Q. Worth $45? A. Yes, sir; I reckon. Three tens and three fives. Q. Go ahead. A. He woke up before I did. I woke when the other fellow did. And we woke up and I put on my stuff and he did, too, and it was about train time, and he taken the bills and put in his pocket, and I taken the silver and we walked right over to the depot, and the train just came in and we had our sacks and little things we had; it over to a little restaurant northwest of the Frisco depot. We got the stuff, and came back and got our tickets to Frederick. I paid for mine, and he paid for his, and sat down. The train was standing there a few minutes, and he got up and walked around, and I got up and he went back, and I went back in, too. We sat down. The train stood a few minutes and when it left, I believe it was a little this side of Davidson, he got up and went to the closet, and he came back and sat down, and he said this is pretty rough riding. I said, 'Isn't this easy riding?' When we got here we went down here to the restaurant to eat. I paid for it, and come up and went down the street to Cooks, I believe, and walked, he walked in the closet and he said he got to go there, and just a little after sun-up he said the postoffice is open then, and he went on and he said, 'By George, I lost your money.' He says, 'The only thing I can do is to go over and have a phone to the conductor or telegram.' I said, 'No use to do that,' and he said, 'Yes, that's right, if somebody found it, he would have taken it.' So he says, 'I might have lost it in the closet of Mr. Cooks,' and he went back and he went in there and looked around and couldn't see it, and he walked back out. Mr. McConnell, we cashed a check at Mr.——— at Vernon. I knew him, and when we came to town it was too late, and we·walked in and I knew

him, and I been there, and Mr. McConnell gave me a check for $38, and I walked to Mr.——— store and hands him the check, and he read it, $38, and he paid it, and I told him I was coming to Frederick, and he said he had a store there at Frederick, I believe he said he had one, and he give us a recommendation and got a piece of paper, and Mr. Bivens taken it and put it in the purse where he had his money and where he put mine, and when we got here he taken it and give it to, Mr. McConnell, and Mr. McConnell told us he could find us a job, and he phoned around and Craig, he lived about a mile from town, I believe, he said Mr. Craig would be in at dinner with a load of corn, and we stood around there awhile and I said, 'Let's go out and pick cotton,' and he said, 'Let's wait until night and go in the wagon,' and he said, 'What's the use of walking.' I said, 'I can pick some cotton before night.' And he says, 'We might go out, and the cotton might not be worth a damn.' He said, 'If you want to go, we will go.' We started out and got out, and Mr. Mongold came along with a wagon and asked where were we going, and we told him, and we rode with him, and he said he had some cotton to pick, and he said he was going to haul the wagon to the field as soon as he goes home, and talked about how much he was giving, six-bits. I said, 'I will go,' and we went out and picked before dinner. I picked 23 pounds, and Mr. Bivens picked 24 pounds. I couldn't hardly eat anything. I felt so sorry my money was gone. I said to Mr. Mongold, I said I, didn't believe I needed any water. I thought that is the way I can get a chance to get away. We went back to the field, and he said, 'You believe I got that money,' and I said, 'For all I know you might.' And he said, 'I wouldn't do that. I wouldn't do anybody that way.' And finally, I had about six or seven pounds in my sack, and I said, 'I got to get some water.' I felt sick, and I taken my sack and emptied it and put in my little stuff and walked to town, and I told Mr. Mongold I was coming to town and what few pounds I picked he could have for that dinner. I walked to town and came around to that gin down yonder below the railroad and met a fellow there. He was talking, and I told him all about it—(Objected to by counsel for defendant as to what he told him.) A. I just told him—(Objected to by counsel for the defendant.) By the Court: Don't tell what he said. Go ahead and tell what you did. A. I seen Mr. Waggoner and told him all about it, and Mr. Waggoner said— (Objected to.) Q. Tell what he did? A. Well, Mr. Waggoner went in and called another fellow. This other fellow is around here somewhere.

Said for him to come along. (Objected to.) Q. Mr. Veal? A. Yes, and we all three got in a buggy and drove out there, and we got over three-fourths of the way and met Mr. Mongold coming in with a load of corn, and we passed Mr. Mongold, and he said, 'Are you coming back out?' and I said, 'Yes,' and he said that fellow is gone. (Objected to.) Q. Go ahead and tell what you did. A. We turned around and came back to town, and we hunted all over in town and could not find him. I talked something about Davidson. I asked him how far it was to Davidson. I believe Mr. Bivens thought I went to Davidson, so we looked all over town, and Mr. Waggoner sent and hired a stable team and we all three of us got something to eat and got in the buggy and drove out there, and got out there out of town, and we looked for tracks and seen his tracks. I said that's about the size of the shoe, and we met a fellow and asked him— (Objected to by counsel for the defendant.) A. We caught him, anyhow, a little piece from Davidson, a few miles probably. Q. What time of the evening was that? A. After sun-down already. Q. What did he do when you caught him? A. I stopped the horses and Mr. Waggoner drew his sixshooter, and they told him to throw up his hands, and he threw up one, and Mr. Waggoner said, 'Throw up your other hand,' and the pocketbook, he threw it back and threw it up, and they asked him how much money he had. They picked the pocketbook up with the money in it. Q Picked up what money? A. I believe that fellow, whatever his name is, he picked it up. He threw away the purse that had the greenbacks in. Q. Bivens did? A. Yes, sir. Q. When he was arrested? A. Yes, sir. So Mr. Waggoner told him, he asked him how much money he had, and he said he had $45.50, and they looked in the purse and Mr. Waggoner said that don't look like 50 cents. He said, 'What for did you throw that money away?' and he said, 'I thought you probably was burglars, and I threw it off.' He asked him where did he get the money, and he said he worked hard for it. Q. Did he take and keep this money by your consent or without it? Q. Was it by your consent and permission that he kept this money? A. No, I didn't want him to keep it. Q. I understood you to say a while ago that when you gave him the money, he said he would give it back the next day? A. Yes, sir; he said that. I told him I would send it off the next morning as soon as the postoffice was open. I told him I had some debts I wanted to pay. He said, you just keep that money and finally you will have about 75 or 100 dollars, and then pay it off. He says that's the way I do. Q. Do you know

what state and county this is? A. Oklahoma, Tillman county. (Cross-examined.) Q. When he told you these things about keeping your money, that you would get it back the next day, did you, did that cause you turn it over? A. Yes, sir. Q. I believe you stated that you asked him for the money after you got to Frederick? A. Yes, sir; I asked him for it. Q. He told you he lost it? A. He said he lost it and said he would pick cotton and pay for it."

John Waggoner testified that about half past six when he arrested the defendant near Davidson, the defendant threw a purse away; that it contained forty-five dollars in one wad, and a separate five dollar bill; that the defendant said that it was his money.

Mr. Veal testified that he was with Mr. Waggoner when the defendant was arrested, and he picked up the pocketbook when the defendant threw it away and gave it to Mr. Waggoner.

Mr. Mongold testified that he hired the prosecuting witness and the defendant to pick cotton; that the little fellow, Weihs, left after dinner; that the defendant left that afternoon and said that he had some money that belonged to the little boy; that he asked the defendant how much he owed the boy, and defendant said five dollars, and said that the boy had given him forty-five dollars, and that he had lost it. When the defendant left he said that he was going to town to find the boy and go home with him.

The foregoing is all the evidence offered on the part of the state.

The defendant demurred to the evidence on the following grounds: First: As not sufficient to warrant a conviction, and for the further reason that the proof shows, that if the defendant is guilty of any offense, it is the offense of obtaining property by false pretenses or embezzlement, and not by grand larceny, as charged in the information, and moved the court to direct a verdict of not guilty. The demurrer and motion were overruled and exception allowed.

The defendant testified on his own behalf in substance as follows: That he met Weihs near Vernon, Texas; that Weihs had forty-five dollars in greenbacks, and gave him the money to keep

for him until the following Saturday; that they came from Vernon, Texas, to Frederick the next morning and went to pick cotton for Mr. Mongold; that afternoon Weihs told him he was sick and left, but did not come back; that about an hour after Weihs left the defendant went to the house and asked where the boy had gone. He told Mongold that he believed that he would go to town and find the boy; that he had some money belonging to him; that on his way to town he met Mr. Waggoner, and dropped the money because he thought they were robbers; that when they arrested him, he told them that it was his money; that five dollars of the fifty dollars in the purse was his money; that when he was arrested he was lost and did not know just where he was, and that the boy had never asked him to give back the money.

The foregoing is all the testimony offered on the trial. The jury returned a verdict of guilty. From an order overruling a motion for a new trial, the defendant appeals.

*Hudson & Mounts,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. The first assignment of error is that the court erred in overruling the demurrer to the information. The objection here urged by the defendant's counsel to the sufficiency of the information is, that it attempts to charge "theft by fraud" in general terms, and that the failure to allege the specific acts constituting fraud is fatal. Citing the case of *Martin v. Territory,* 4 Okla. 105.

The Supreme Court of Oklahoma Territory passed directly upon this question in the case of *Flohr v. Territory,* 14 Okla. 477. Mr. Justice Gillette, delivering the opinion of the court, after reviewing numerous decisions, in conclusion said:

"We are referred to no case or authorities supporting the defendant's contention in this respect, except the case of *Martin v. Territory, supra,* which, as we have before remarked, does not go to the extent of holding that in an indictment where a fraud-

ulent taking is charged, it is necessary to set out the acts relied upon as constituting the fraud, and we must hold, therefore, on the strength of the authorities above cited, that it is not necessary, and that the crime of larceny may be satisfactorily shown by proof that, at the time of taking the property, it was taken with the felonious intent to convert it to the taker's own use, and to deprive the owner thereof, regardless of the fact as to whether the taking was accomplished by fraud or stealth."

We think the information sufficiently charges the crime of larceny by fraud.

The next assignment, that the court erred in overruling the defendant's demurrer to the evidence introduced by the state, is equally untenable.

Under the provisions of the Penal Code, larceny and embezzlement are defined as follows:

Section 2591, Snyder's Stat.:

"Larceny is the taking of personal property, accomplished by fraud or stealth, and with intent to deprive another thereof."

Section 2609:

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted."

As to the distinction between the two crimes as defined by the statute, in the case of *Flohr v. Territory, supra,* it is said:

"In larceny the criminal intent must exist at the time of taking the property, and it must be taken, when taken, with intent to appropriate it to the taker's own use, and to deprive another thereof. It may be taken by stealth with such intent, or it may be taken with the owner's knowledge through fraudulent practice, by which the owner was induced to give up possession without parting with the. title or right to the property, and if the taker receives it under such circumstances intending to convert it to his own use and thereby deprive the owner thereof, the crime is larceny.

"If, on the other hand, the property is received by the taker as a bailment, or the right of possession is entrusted to him by the owner with intent to confer upon the taker· the present use and possession of the property to be afterwards re-delivered to the owner, and the taker receives it intending a compliance with the terms upon which he receives it, and after he ·has received it ·

with such intent, he converts it to his own use intending to deprive the owner thereof, the crime is embezzlement."

If the owner of personal property parts with the possession of the same for a particular purpose, and the person who receives the possession avowedly for that purpose has a fraudulent intention to make use of the possession as a means of converting such property to his own use, and does so convert it, the crime is larceny.

Under this assignment it is also contended that the evidence is not sufficient to sustain a conviction, because the owner voluntarily parted with the possession of his property for a specified time and then did not ask a return of the same.

We think this was entirely a question for the jury. Taking all the facts and circumstances surrounding the taking of the money by the defendant from the owner, they are sufficient to show the felonious intent of the defendant at the time of the taking, and that it was taken by fraud, with the design then entertained to deprive the owner thereof, which the state was bound to prove, and the fact that the defendant in possession of the stolen property distinctly asserted his ownership, is evidence of the fact that he intended at the time of the taking to deprive the owner thereof and convert it to his own use.

It is further contended that if the proof on the part of the prosecution tends to show the commission of larceny by fraud, the commission of the crime was complete in the state of Texas; that larceny by fraud is in the nature of a local offense, and for this reason the defendant could not be convicted of the offense in Oklahoma.

We think the fact that the defendant secured the possession of the property in Texas in no way detracts from the force and effect of his fraudulent acts, and the facts in evidence showing fraudulent intent in taking the property from the owner. The right of possession, as well as the right of the property, remained in the owner all the time as a matter of law, if the original taking and transportation of the property was under such circumstances as constituted a larceny.

Our Penal Code provides that (section 2605, Snyder's Stat.) :

"Every person who steals the property of another, in any other state or country, and brings the same into this state may be convicted and punished in the same manner as if such larceny had been committed in this state, and such larceny may be charged to have been committed in any town or city into and through which such stolen property has been brought."

We do not deem it necessary to further discuss the arguments upon the defendant's behalf, because we regard the contentions as entirely devoid of merit.

Not a single authority is cited supporting the assignments of error predicated on the instructions requested and refused, and on the instructions given. We find that the instructions given by the court fairly state the law of the case.

Our conclusion is that the defendant had a fair, impartial, and legal trial, and the judgment of conviction is manifestly just. It will therefore be affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.